UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| SALVADOR DAVID GEROLAGA, | 1:06-CV-1759 JMD HC |
| Petitioner, | ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS |
| v. | ORDER DIRECTING CLERK OF COURT TO ENTER JUDGMENT |
| D. ADAMS, Warden, | |
| Respondent. | ORDER DECLINING ISSUANCE OF CERTIFICATE OF APPEALABILITY |

Petitioner is a state prisoner proceeding pro se with a petition for writ of habeas corpus pursuant to 28 U.S.C. § 2254.

**BACKGROUND**

Petitioner is currently in the custody of the California Department of Corrections pursuant to a judgment of the Stanislaus County Superior Court. On June 17, 2005, a jury found Petitioner guilty of one count of possession of a firearm by a felon (Cal. Penal Code § 12021(a)). The jury also found that Petitioner possessed the firearm for the benefit of a criminal street gang (Cal. Penal Code § 186.22(b)(1)). Petitioner admitted that he had served three prior prison terms. (Cal. Penal Code § 667.5(b)). The court sentenced Petitioner to an aggregate term of ten years in state prison, consisting of an upper term of three years for the firearm possession offense, an aggravated four-year gang enhancement, and three one-year prior prison term enhancements. (Answer at 1-4.)

1  Petitioner appealed to the California Court of Appeal.  On September 7, 2006, the court
2  affirmed the judgment. (Lodged Doc. 4.)
3  Petitioner then appealed to the California Supreme Court.  On November 15, 2006, the court
4  denied review "without prejudice to any relief to which defendant might be entitled after the United
5  States Supreme Court determines in *Cunningham v. California*, No. 05-6551, the effect of *Blakely v.*
6  *Washington* (2004) 542 U.S. 296 and *United States v. Booker* (2005) 543 U.S. 220, on California
7  law."  (Lodged Doc. 5.)
8  On November 14, 2006, Petitioner filed a petition for writ of habeas corpus in the California
9  Court of Appeal, Fifth Appellate District.  The petition did not challenge the basis of Petitioner's
10  conviction and sentence. (Lodged Doc. 6.)  On December 15, 2006, the court denied the petition
11  "without prejudice to refile it in the Third District Court of Appeal since it challenges a gang
12  validation determination that was made at High Desert State Prison."  (Id.)
13  On December 6, 2006, Petitioner filed the instant petition in this Court.  The petition raises
14  the following three grounds for relief: 1) ineffective assistance of trial counsel based on counsel's
15  failure to object to the testimony of a gang expert; 2) insufficient evidence to support the gang
16  benefit enhancement; and 3) trial court violated Petitioner's rights to a jury trial and due process by
17  imposing upper terms based on factors that were not found true by a jury beyond a reasonable doubt.
18  On February 22, 2007, Petitioner filed a motion to supplement the petition.  (Court Doc. 10.)
19  On March 5, 2007, the Court granted the motion to supplement the petition.  (Court Doc. 11.)
20  On March 27, 2007, Respondent filed an answer to the petition.
21  On April 9, 2007, Petitioner filed a traverse to the answer.

**FACTUAL BACKGROUND**[1]

23  At 1:00 a.m. on September 18, 2004, Ceres Police Detectives Dennis Perry and Trenton
24  Johnson stopped a vehicle with an expired registration.  Both Johnson and Perry were members of
25  the Ceres Police Department Gang Enforcement Unit.  The stop took place in a darkened area near
26  an orchard and the detectives found two occupants in the vehicle.  A woman was seated behind the

---

[1] The facts are derived from the factual summary set forth by the California Court of Appeal in its opinion of September 7, 2006 and are presumed correct.  28 U.S.C. §§ 2254(d)(2), (e)(1); Lodged Doc. 4.

1  steering wheel and Petitioner was seated in the front passenger seat.  Petitioner had been convicted of
2  second degree burglary, a felony, on February 10, 1997.  Detective Perry approached the driver and
3  Detective Johnson stood on the passenger side of the car.
4      When Detective Perry crouched down to speak with the driver, he looked inside the vehicle,
5  saw Petitioner in the passenger seat, and said, "Salvador Gerolaga, let me see your hands."
6  Petitioner stared at Detective Perry, moved his hands from his lap, and reached down toward the area
7  between the right side of the passenger seat and the interior of the passenger door.  Detective Perry
8  backed away from the vehicle and yelled to Johnson, "He's going for a gun."  Both detectives drew
9  their weapons, pointed them at Petitioner, and shined their flashlights in the passenger compartment.
10 Detective Perry repeatedly ordered Petitioner to put his hands on his head.  Petitioner refused to obey
11 the orders and continued to reach down the right side of the passenger seat.  Detective Perry
12 described Petitioner's activity as a back-and-forth motion and said it appeared Petitioner was trying
13 to pull out something.
14     Detective Johnson ultimately tapped the passenger side window with the barrel of his
15 firearm, pointed it at Petitioner, and said, "Don't make me shoot you."  Petitioner looked at Johnson
16 and the firearm, interlocked his fingers, and then placed his hands on his head.  Johnson opened the
17 door and ordered Petitioner to get out of the car.  Johnson then grabbed Petitioner's hands and helped
18 Petitioner get out of the car.  While doing so, Johnson noticed a handgun stuffed between the plastic
19 molding and the passenger seat.  The molding was in the area where Petitioner had been reaching
20 with his hand.  Johnson then placed Petitioner under arrest and retrieved the gun from the car.  The
21 gun had been wedged in so tightly that officers had to use some force to remove it.  Perry said the
22 weapon was an operable black Lorcin .25-caliber semiautomatic handgun.  The weapon was loaded
23 with five bullets, including one bullet in the firing chamber.
24     Detective Perry and Stanislaus County Deputy Sheriff Paul Teso testified as experts on
25 criminal street gangs.  Teso said he was a member of the Sheriff's Department Gang Intelligence
26 Task Force.  According to Perry and Teso, the Nortenos are a Hispanic street gang with thousands of
27 members across Northern California, including Stanislaus County.  The Nortenos are an offspring of
28 two Hispanic prison gangs, Nuestra Familia and Nuestra Raza (also known as the Northern

1  Structure).  The Surenos criminal street gang is the main rival of the Nortenos gang.  The primary
2  criminal activities of the Nortenos include drive-by shootings, robberies, carjacking, narcotics sales
3  and possession, weapons possession, auto theft, and burglaries.

4        Detective Perry and Deputy Teso said the common identifying color associated with the
5  Nortenos is red and their symbols include the numbers "14" or "XIV," the letter "N," the word
6  "Norte," and the "Huelga" bird symbol.  The "Huelga" is an Aztec design of an eagle and is also
7  used as a symbol of the United Farmworkers Union.  The gang version of the design has five layers
8  or steps in the wings of the bird.  Deputy Teso said the five-step wings stood for "N-o-r-t-e."  The
9  United Farm Workers Union version has four layers or steps in the wings of the bird.  Detective
10 Perry said gang members want people to fear and respect them and "carry guns with them 24/7."
11 According to Perry, gang members carry weapons to protect themselves from other rival gang
12 members.

13       Deputy Teso testified that members of the Nortenos "put in work."  He explained that
14 Norteno members commit different crimes and get their names known so they can move up in the
15 ranks of the gang and become members of the Northern Structure.  Members of the Northern
16 Structure commit further crimes to move up the ranks and become members of Nuestra Familia.
17 According to Detective Perry, the lowest-ranking gang members are called "youngsters" and the
18 highest-ranking member is called the "shot-caller."  Youngsters look up to the shot-callers and seek
19 the status of "ghetto superstar," a gang member who will be written or talked about.  Generally
20 speaking, prison gang members who are paroled become street gang members.  Northern Structure
21 members who are paroled remain Nortenos but are ranked higher than other Nortenos.  Teso said he
22 had been a gang classification deputy at the Stanislaus County Jail since 1999.  As part of his duties,
23 Deputy Teso interviewed inmates who claimed to be gang members, gathered intelligence on their
24 status, and determined the best and appropriate housing for gang members by separating them from
25 rival gang members.  Deputy Teso said he gathered information by scanning inmate mail, monitoring
26 their telephone calls, monitoring their visits, and conducting interviews.

27       In the view of Deputy Teso, Petitioner was a member of the Northern Structure.  On one
28 occasion in 1999, Petitioner's cell in county jail was searched.  The search yielded a "wila," a

miniature piece of paper bearing very small writing. The "wila" contained the 14 bonds, household policies, or commands of Nuestra Familia. The 14 bonds instructed gang members how Nortenos are to behave on the streets and while in custody. In 2001, Petitioner was a "shot-caller" and a "channel," according to Deputy Teso. Teso explained a shot-caller is a gang member with authority who runs a correctional facility for the gang. A "channel" is a gang member who relays information from a jail or prison to the streets. Teso also testified that Petitioner had the gang monikers "Little Sal" and "Mumbles." Petitioner's body bore a number of tattoos, including "XIV," "Norte," one dot on his right hand and four dots on his left hand, and tattoos of the five-step Huelga bird on his hand and forehead. Deputy Teso explained the letter "N" is the 14th letter in the alphabet and the number 14 is a symbol for Nortenos, Northern Structure, and Nuestra Familia. In 2005, Petitioner admitted to Teso that he was a member of the Northern Structure but denied membership in the Nortenos. Deputy Teso cited evidence that Nortenos engaged in a pattern of criminal gang activity. He said their crimes included Petitioner's armed commission of a car burglary in 1997, Petitioner's possession of an inmate-manufactured weapon while in prison in 1999, Petitioner's participation in a melee in state prison, and Petitioner's assault on his uncle, an incarcerated Norteno dropout, in 2001. The prosecution also introduced evidence of crimes committed by one Cecilio Pazos, an admitted and verified member of the Nortenos. Pazo's crimes included felony auto theft, assault with a deadly weapon, a home invasion robbery, and participation in the gang attack on Petitioner's uncle in state prison. Detective Perry said Pazos was also a member of the Northern Structure.

According to Deputy Teso, Petitioner admitted he was a member of the Nortenos to a member of the Northern Structure prison gang in 2005. Teso also said the California Department of Corrections (CDC) had classified him as a validated member of the Northern Structure. Teso and Perry further explained a Northern Structure member, upon release from prison, has a higher status than a regular member of the Nortenos gang. When Petitioner entered the Stanislaus County Jail following his arrest on the current offense, he immediately sought to assume control of the facility as "the main overall," a gang member in charge of a facility. Deputy Teso monitored Petitioner's telephone calls. During those calls, Petitioner contacted known gang members to vouch for him as sponsors so he could assume control of the facility. At the time of trial, Petitioner was classified as a

"[m]aximum security inmate."

In Detective Perry's opinion, Petitioner's possession of the firearm on September 18, 2004, benefitted the Nortenos street gang because Petitioner was a "walking ambassador" for the gang. The detective also testified that Petitioner possessed the firearm with the specific intent to promote, further, or assist in the criminal conduct of the Nortenos gang because "firearms are tools of the trade that most gang members will keep with them 24-7. If he would have used that firearm that day and either fire rounds at me or fire rounds at an officer his status in the gang would have been raised ten-fold." Perry further testified that the shooting of an officer would have conferred "super star" status on Petitioner and would constitute "the final notch that he would have needed to go [from] a [N]orthern [Structure] member to a Nuestra Familia member." Perry also said younger gang members would have looked up to Petitioner had he shot one of the detectives. Perry also testified that other gang members would have used the weapon if Petitioner had been able to dispose of it. Detective Perry also explained that Norteno gang members share their weapons with other members because weapons are sometimes hard to acquire. In addition, gang members who use a gun to commit a crime will pass the gun off so it will not be found in their possession.

Petitioner's Defense

Patricia Castrillo testified she was driving the car that Detectives Perry and Johnson stopped on September 18, 2004. According to Castrillo, Petitioner had two cellular telephones on his lap when the detectives stopped the vehicle. One of the phones kept ringing during the incident and Petitioner attempted to switch it to the silent mode. Johnson confirmed that Petitioner had two cell phones at the time of his arrest. According to Johnson, one phone was located in the cargo pocket of his pants, close to his thigh. Johnson did not hear the phone ringing in the car and Petitioner did not appear to be reaching for a phone during the detention.

Castrillo further testified she loaned her car to someone else on September 17, 2004 and she was unaware of the presence of a weapon when the detectives stopped her vehicle early the next day. Petitioner's wife, Veronica Beltran, and his mother, Mary Montano, testified Petitioner was not a gang member and that Ceres Police and several parole agents had been harassing Petitioner's family. According to Beltran and Montano, the parole agents and police officers, including Detective Perry,

frequently raided and searched their family residence.

Wayne Flores, a parole agent for the CDC, testified he was Petitioner's parole agent. Flores said his duty was to assure Petitioner's compliance with the conditions of parole. Petitioner's case file contained a form 611 which indicated that Petitioner "was gang affiliated with Northern Structure and he was verified." One of the parole conditions placed on Petitioner was that he not affiliate with gang members.

Flores said Petitioner was paroled on July 2, 2004, and he had multiple contacts with Petitioner between the date of parole and the date of Petitioner's arrest in September 2004. On July 5, 2004, Modesto Police Officer Ciccarelli contacted Flores and said he had information that Petitioner was going to commit a murder on behalf of Nuestra Familia that evening. Flores authorized Modesto Police to locate Petitioner and Flores placed a parole hold on him. Flores later released the hold on July 14, 2004. Flores testified that he normally places a parole hold on an individual when the safety and security of the community are threatened by the occurrence of a crime or the probability of such an occurrence.

Michael Brodie, a parole agent with the CDC, testified he was a member of the Stanislaus County Gang Task Force and had been acquainted with Petitioner's case for about five years. Brodie became familiar with Petitioner based on his prison gang activity. Brodie said Petitioner was a member of the Northern Structure and a validated gang member. Brodie also said Petitioner's residence in Ceres was a documented gang house because of activities involving the Norteno gang membership.

Brodie was aware of the gang contact provision and was concerned about Petitioner's recent correspondence with one James Perez Conejo. Brodie said the correspondence occurred after September 18, 2004, and he further testified:

> I recently received a letter or two letters from Pelican Bay written from Mr. Gerolaga to a James Perez Conejo. Mr. Perez is currently one of the new members on the mesa-after the Black Widow came down and a lot of the older time Nuestra Familia members became federal indictments under another structure. James Perez is one of the structures that have taken the place of one of the old regime. And I received two letters that Mr. Gerolaga had written to Mr. James Perez through his girlfriend as the P.O. box or the drop box for that.

Petitioner's mother, Mary Montano, said Petitioner's sole nickname was "Mumbles." She

explained he had a stuttering problem since he was in elementary school and the nickname came about because "[h]e speaks slowly, then he starts rapidly, then he starts stuttering." Mrs. Montano acknowledged that Petitioner had a tattoo on his forehead but said it signified the United Farm Workers. She explained her in-laws, Petitioner's grandparents, had been farm laborers.

## DISCUSSION

**I. Jurisdiction**

Relief by way of a petition for writ of habeas corpus extends to a person in custody pursuant to the judgment of a state court if the custody is in violation of the Constitution or laws or treaties of the United States. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(c)(3); Williams v. Taylor, 529 U.S. 362, 375 n.7 (2000). Petitioner asserts that he suffered violations of his rights as guaranteed by the U.S. Constitution. In addition, the conviction challenged arises out of the Stanislaus County Superior Court, which is located within the jurisdiction of this court. 28 U.S.C. § 2254(a); 28 U.S.C. § 2241(d). Accordingly, the Court has jurisdiction over the action.

On April 24, 1996, Congress enacted the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), which applies to all petitions for writ of habeas corpus filed after its enactment. Lindh v. Murphy, 521 U.S. 320 (1997), *cert. denied,* 522 U.S. 1008 (1997); Jeffries v. Wood, 114 F.3d 1484, 1499 (9th Cir. 1997), *quoting* Drinkard v. Johnson, 97 F.3d 751, 769 (5th Cir. 1996), *cert. denied,* 520 U.S. 1107 (1997), *overruled on other grounds by* Lindh v. Murphy, 521 U.S. 320 (1997) (holding AEDPA only applicable to cases filed after statute's enactment). The instant petition was filed after the enactment of the AEDPA; thus, it is governed by its provisions.

**II. Legal Standard of Review**

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a).

The instant petition is reviewed under the provisions of the Antiterrorism and Effective Death Penalty Act which became effective on April 24, 1996. Lockyer v. Andrade, 538 U.S. 63, 70 (2003). Under the AEDPA, an application for habeas corpus will not be granted unless the adjudication of the claim "resulted in a decision that was contrary to, or involved an unreasonable application of,

clearly established Federal law, as determined by the Supreme Court of the United States" or "resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State Court proceeding." 28 U.S.C. § 2254(d); see Lockyer, 538 U.S. at 70-71; see Williams, 529 U.S. at 413.

As a threshold matter, this Court must "first decide what constitutes 'clearly established Federal law, as determined by the Supreme Court of the United States.'" Lockyer, 538 U.S. at 71, *quoting* 28 U.S.C. § 2254(d)(1). In ascertaining what is "clearly established Federal law," this Court must look to the "holdings, as opposed to the dicta, of [the Supreme Court's] decisions as of the time of the relevant state-court decision." Id., *quoting* Williams, 592 U.S. at 412. "In other words, 'clearly established Federal law' under § 2254(d)(1) is the governing legal principle or principles set forth by the Supreme Court at the time the state court renders its decision." Id.

Finally, this Court must consider whether the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law." Lockyer, 538 U.S. at 72, *quoting* 28 U.S.C. § 2254(d)(1). "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams, 529 U.S. at 413; see also Lockyer, 538 U.S. at 72. "Under the 'reasonable application clause,' a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decisions but unreasonably applies that principle to the facts of the prisoner's case." Williams, 529 U.S. at 413.

"[A] federal court may not issue the writ simply because the court concludes in its independent judgment that the relevant state court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

Petitioner has the burden of establishing that the decision of the state court is contrary to or involved an unreasonable application of United States Supreme Court precedent. Baylor v. Estelle, 94 F.3d 1321, 1325 (9th Cir. 1996). Although only Supreme Court law is binding on the states,

Ninth Circuit precedent remains relevant persuasive authority in determining whether a state court decision is objectively unreasonable. See Duhaime v. Ducharme, 200 F.3d 597, 600-01 (9th Cir. 1999).

AEDPA requires that we give considerable deference to state court decisions. The state court's factual findings are presumed correct, 28 U.S.C. § 2254(e)(1), and we are bound by a state's interpretation of its own laws. Souch v. Schaivo, 289 F.3d 616, 621 (9th Cir. 2002), *cert. denied*, 537 U.S. 859 (2002), *rehearing denied*, 537 U.S. 1149 (2003).

**III. Review of Petitioner's Claims**

**A. Ground One**

Petitioner argues that his trial counsel was ineffective in failing to object to testimony by a gang expert regarding Petitioner's intent to benefit a street gang by unlawfully possessing a firearm. Petitioner claims that the expert improperly testified to Petitioner's mental state and intent at the time of the crime.

The testimony at issue, given by Detective Dennis Perry during direct examination by the prosecutor, is as follows:

> Q: Based on your participation in the September 18th, 2004 arrest of Salvador Gerolaga . . . do you have an opinion whether or not the possession of that firearm was committed for the benefit of and at the direction of or in association with a criminal street gang?
>
> A: Yes, I do.
>
> Q: What is that opinion?
>
> A: My opinion is that Mr. Gerolaga is a walking ambassador for the Norteno street gang. As I told you before that firearms are tools of the trade that most gang members will keep with them 24-7. If he would have used that firearm that day and either fire rounds at me or fire rounds at an officer his status in the gang would have been raised ten-fold. [¶] I talked yesterday about becoming a super star, and he would have reached that status and that would be the final notch that he would have needed to go to a northern member to a Nuestra Familia member.
>
> Q: Tell us how younger members would benefit from Mr. Gerolaga on September 18th, 2004[.]
>
> A: The youngsters on the street that now look up to Mr. Gerolaga would look up to him even more because he has shown that not only would he kill a police officer but he has no fear to kill anybody else. His status would have risen. [¶] The youngsters would have wanted to be like him and would probably model theirselves [sic] just after him.

U.S. District Court
E. D. California   Jp                             10

> Q: Finally, do you have an opinion whether or not the possession of this weapon on September 18th was committed with the specific intent to promote, further or assist in any criminal conduct by Norteno gang members?
>
> A: Yes, I do.
>
> Q: Tell the jury about that please.
>
> A: Pretty much the same as I said. Gang members don't hang on to guns once they've committed a crime or they have them for a certain amount of time. They pass those guns on to other gang members so they can also commit crimes. [¶] That gun could be used several times and commit several crimes in the future.
>
> Q: What type of crimes?
>
> A: As I said yesterday, could be anything from home invasion robbery, for protection, for witness intimidation, armed robberies, assumption, drive-by shootings, you name it.
>
> Q: You're talking about the prime activities of the Norteno criminal street gang?
>
> A: Yes, I am.

(Lodged Doc. 2 at 271-73.)

This claim was presented in an appeal to the California Court of Appeal, which affirmed the judgment on September 7, 2006. (Lodged Doc. 4.) The issue was then presented to the California Supreme Court, which denied review on November 15, 2006. (Lodged Doc. 5.) The California Supreme Court, by its "silent order" denying review, is presumed to have denied the claims presented for the same reasons stated in the opinion of the lower court. Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).

In rejecting Petitioner's claim, the Court of Appeal found that counsel was not deficient in failing to object to the expert's testimony because he testified only to the culture, habits, and psychology of gangs, and not to Petitioner's own specific intent, which is permissible under California law. (Lodged Doc. 4 at 23-25.)

The law governing ineffective assistance of counsel claims is clearly established for the purposes of the AEDPA deference standard set forth in 28 U.S.C. § 2254(d). Canales v. Roe, 151 F.3d 1226, 1229 (9th Cir. 1998.) In a petition for writ of habeas corpus alleging ineffective assistance of counsel, the court must consider two factors. Strickland v. Washington, 466 U.S. 668, 687 (1984); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994). First, the petitioner must show that counsel's performance was deficient, requiring a showing that counsel made errors so serious that he

or she was not functioning as the "counsel" guaranteed by the Sixth Amendment. Strickland, 466 U.S. at 687. The petitioner must show that counsel's representation fell below an objective standard of reasonableness, and must identify counsel's alleged acts or omissions that were not the result of reasonable professional judgment considering the circumstances. Id. at 688; United States v. Quintero-Barraza, 78 F.3d 1344, 1348 (9th Cir. 1995). Judicial scrutiny of counsel's performance is highly deferential. A court indulges a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance. Strickland, 466 U.S. at 687; Sanders v. Ratelle, 21 F.3d 1446, 1456 (9th Cir. 1994).

Second, the petitioner must demonstrate that "there is a reasonable probability that, but for counsel's unprofessional errors, the result ... would have been different." Strickland, 466 U.S. at 694. Petitioner must show that counsel's errors were so egregious as to deprive defendant of a fair trial, one whose result is reliable. Id. at 688. The court must evaluate whether the entire trial was fundamentally unfair or unreliable because of counsel's ineffectiveness. Id.; Quintero-Barraza, 78 F.3d at 1345; United States v. Palomba, 31 F.3d 1356, 1461 (9th Cir. 1994).

The state court's determination was not contrary to or an unreasonable application of *Strickland*. The Court of Appeal found that the testimony in question was admissible under state law. The California Supreme Court subsequently denied review, presumably denying the claim for the reasons stated by the lower court. Petitioner has therefore not shown that his counsel was deficient in failing to object, as the state courts determined that the testimony in question was admissible. This Court must accept a state court's ruling on a question of state evidence law except when it appears that its interpretation is an obvious subterfuge to evade consideration of a federal issue. Mullaney v. Wilbur, 421 U.S. 684, 690-91 & n.11 (1975); Carter v. Marshall, 1995 WL 86539, *1-2 (N.D. Cal. 1995); see also Gomez v. Pliler, 212 Fed.Appx. 687, 689-90 (9th Cir. 2006) ("We must defer to a state court's application of its own rules of evidence.").

**B. Ground Two**

Petitioner argues that there was insufficient evidence to support the gang benefit enhancement pursuant to Penal Code section 186.22(b)(1). Petitioner claims that the prosecution did not establish that he possessed the firearm with the specific intent to promote or further gang activity.

1   This claim was presented in an appeal to the California Court of Appeal, which affirmed the judgment on September 7, 2006. (Lodged Doc. 4.) The issue was then presented to the California Supreme Court, which denied review on November 15, 2006. (Lodged Doc. 5.) The California Supreme Court, by its "silent order" denying review, is presumed to have denied the claims presented for the same reasons stated in the opinion of the lower court. Ylst v. Nunnemaker, 501 U.S. 797, 803 (1991).

In rejecting Petitioner's claim, the Court of Appeal found that substantial evidence supported the gang benefit enhancement, as the jury could reasonably infer from Detective Perry's testimony that Petitioner possessed the firearm to commit crimes on behalf of the Norteno gang or to protect himself and fellow gang members from rival gang members. (Lodged Doc. 4 at 28.)

A federal habeas court reviews sufficiency of evidence claims by determining "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Lewis v. Jeffers, 497 U.S. 764, 781 (1990); Jackson v. Virginia, 443 U.S. 307, 318-19 (1979). "[T]he standard must be applied with explicit reference to the substantive elements of the criminal offense as defined by state law." Jackson v. Virginia, 443 U.S. 307, 324 n.16 (1979). Penal Code section 186.22(b)(1) provides additional punishment for "any person who is convicted of a felony committed for the benefit of, at the direction of, or in association with any criminal street gang, with the specific intent to promote, further, or assist in any criminal conduct by gang members." Cal. Penal Code § 186.22(b)(1).

The state court's determination was not unreasonable. Detective Perry testified that committing crimes was the prime activity of the Norteno gang and that most of its members always carried guns, which they used to commit crimes and to protect themselves from other gangs. Detective Perry also testified that gang members would share their guns to rid themselves of incriminating evidence after a crime was committed and to allow other gang members to commit further crimes. (Lodged Doc. 2 at 271-73.) This testimony, when viewed in the light most favorable to the prosecution, was sufficient for a rational trier of fact to find that Petitioner possessed the firearm with the specific intent to promote criminal conduct by members of the Norteno gang.

**C. Ground Three**

Petitioner argues that he was deprived of his rights to a jury trial and due process when the trial court sentenced him to upper terms based on factors that were not found by the jury beyond a reasonable doubt.

At the opening of Petitioner's sentencing hearing, the trial court announced that it had read the probation officer's amended report. (Lodged Doc. 2 at 476.) The report noted, among other things, that Petitioner had numerous convictions as a juvenile and that, as an adult, he had sustained felony convictions on four separate occasions, a misdemeanor conviction, and numerous probation violations. (Lodged Doc. 1 at 126-27.) The report listed as circumstances in aggravation 1) the manner in which the crime was carried out indicated planning, sophistication, or professionalism; 2) Petitioner's prior adult and juvenile convictions were numerous; 3) Petitioner was on parole when the crime was committed; and 4) Petitioner's prior performance on probation and parole was unsatisfactory. (Id. at 129.) There were no circumstances listed in mitigation. (Id.)

After the trial court heard from counsel for both sides regarding sentencing, the judge stated as follows:

> Okay. I was unable to find the – of the mitigating factors listed in the thing here as being in the Rules of Court, 4.423 as being applicable to the Defendant in this case. I note that the Defendant – I do agree with the defense that the factor in aggravation 4.42[1](a) that the crime indicated for crimes of sophistication and professionalism, I'm not sure that that necessarily applies in this case. However, the remaining factors, that namely the Defendant's prior convictions are numerous and he was on parole, and that his prior performance on parole and probation had been unsatisfactory are applicable in this case.

(Lodged Doc. 2 at 476-81.) The trial court then sentenced Petitioner to an aggravated three-year term on the unlawful possession of a firearm count. (Id. at 481.)

The court then asked counsel what factors should be considered in mitigation or aggravation of the gang benefit enhancement. (Id.) The prosecution referred to Petitioner's gang activity both prior to and following his arrest for possession of the firearm, while defense counsel argued that there was no evidence that Petitioner associated with gang members while outside of prison. (Id. at 481-83.) The court then announced Petitioner's sentence for the gang benefit enhancement as follows:

> All right. Based on the evidence heard in trial and as to Defendant's position and

U.S. District Court
E. D. California

Jp

14

activities in the gang, the Court would be imposing the aggravated term for the gang enhancement of four years[.]

(Id. at 483.)

This claim was presented in an appeal to the California Court of Appeal, which affirmed the judgment on September 7, 2006. (Lodged Doc. 4.) In doing so, the court relied on *People v. Black*, 35 Cal.4th 1238 (2005), which found that the imposition of an upper term based on judicial factfinding pursuant to California's determinate sentencing law was not contrary to the Sixth Amendment, and *People v. McGee*, 38 Cal.4th 682, 687 (2006), which found no Sixth Amendment violation where the trial court imposed an increased sentence based on its finding that the defendant's previous robbery convictions were "serious felonies." (Lodged Doc. 4 at 28-30.) The issue was then presented to the California Supreme Court, which denied review "without prejudice to any relief to which defendant might be entitled after the United States Supreme Court determines in *Cunningham v. California*, No. 05-6551, the effect of *Blakely v. Washington* (2004) 542 U.S. 296 and *United States v. Booker* (2005) 543 U.S. 220, on California law." (Lodged Doc. 5.) In *Cunningham*, the Supreme Court held that California's determinate sentencing law violated the Sixth Amendment because it permitted the imposition of upper terms based on facts found by the judge rather than by the jury beyond a reasonable doubt. Cunningham v. California, 127 S.Ct. 856, 871 (2007).

1. Stay pending further state proceedings

Initially, Respondent argues that the Court must stay this petition and order Petitioner to present his claim to the California Supreme Court because *Cunningham* "casts the constitutionality of California's sentencing scheme in a fundamentally different light." (Answer at 26.) The Ninth Circuit Court of Appeals, however, has rejected this argument. Butler v. Curry, 528 F.3d 624, 639 (9th Cir. 2008).

2. Merits

While *Cunningham* held that the imposition of an upper term based on aggravating factors not found by the jury violated the Sixth Amendment, the Court retained an exception for findings of a defendant's prior convictions. Cunningham v. California, 127 S.Ct. 856, 868 (2007) ("Except for a

prior conviction, 'any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt.'"). While the precise scope of the prior conviction exception is unclear, federal appellate courts have found that judges can make findings beyond the mere fact of a prior conviction without infringing on the Sixth Amendment. See e.g., U.S. v. Santiago, 268 F.3d 151, 156-57 (2d Cir. 2001) (finding that judge may determine whether prior convictions occurred on different occasions); U.S. v. Smith, 474 F.3d 888, 892 (6th Cir. 2007) (finding that judge may determine whether the defendant's criminal history was extensive and egregious); U.S. v. Kempis-Bonola, 287 F.3d 699, 703 (8th Cir. 2002) (finding that judge may determine whether prior conviction was "aggravated" felony); U.S. v. Corchado, 427 F.3d 815, 820 (10th Cir. 2005) (finding that judge may determine whether defendant was on probation at the time of the crime); Butler v. Curry, 528 F.3d 624, 647 (9th Cir. 2008) (finding that judge may *not* determine whether defendant was on probation at the time of the crime).

Here, the state court's determination that Petitioner's rights were not violated by the imposition of upper terms was not an unreasonable application of Supreme Court law, as the trial court imposed upper terms only after finding that Petitioner's prior convictions were numerous. See Lodged Doc. 2 at 481 ("[T]he remaining factors, that namely the Defendant's prior convictions are numerous and he was on parole, and that his prior performance on parole and probation had been unsatisfactory are applicable in this case.") The Court of Appeal could reasonably conclude that this finding fell within the prior conviction exception and that Petitioner's Sixth Amendment rights were therefore not violated. Further, based solely on the finding that Petitioner had numerous prior convictions, the trial court could impose upper terms, as a single aggravating factor is sufficient to render a defendant eligible for an upper term under California law. Cal. Rules of Court, Rule 4.421(b)(2) (stating that circumstances in aggravation include a defendant's prior adult convictions if they are numerous or of increasing seriousness); Butler v. Curry, 528 F.3d 624, 641-42 (9th Cir. 2008) (stating that federal courts must defer to a state court's interpretation of state law and finding that, under California law, only one aggravating factor is necessary to authorize an upper term sentence). The fact that the trial court may have also relied on other factors not falling within the prior conviction exception in selecting the upper terms does not affect the analysis. Id. at 648-49

("[T]he relevant question [regarding a Sixth Amendment sentencing violation] is not what the trial court would have done, but what it legally could have done. After one aggravating factor was validly found, the trial court legally could have imposed the upper term sentence. That the judge might not have done so in the absence of an additional factor does not implicate the Sixth Amendment, as that consideration concerns only the imposition of a sentence within an authorized statutory range.").

Furthermore, even assuming that a constitutional violation occurred, any sentencing error was harmless as this Court is not in grave doubt as to whether the jury would have found that Petitioner's prior adult convictions were numerous. See Butler v. Curry, 528 F.3d 624, 648 (9th Cir. 2008) (stating that *Apprendi* error will only be considered prejudicial if there is grave doubt as to whether a jury would have found any of the relevant aggravating factors beyond a reasonable doubt). Petitioner, in five separate cases as an adult, had been convicted of receiving stolen property, second degree burglary, possession of a controlled substance, trespass, and unlawful possession of a weapon. (Lodged Doc. 1 at 126-27.)

**IV.  Certificate of Appealability**

A state prisoner seeking a writ of habeas corpus has no absolute entitlement to appeal a district court's denial of his petition, and an appeal is only allowed in certain circumstances. Miller-El v. Cockrell, 123 S.Ct. 1029, 1039 (2003). The controlling statute in determining whether to issue a certificate of appealability is 28 U.S.C. § 2253, which provides as follows:

> (a) In a habeas corpus proceeding or a proceeding under section 2255 before a district judge, the final order shall be subject to review, on appeal, by the court of appeals for the circuit in which the proceeding is held.
>
> (b) There shall be no right of appeal from a final order in a proceeding to test the validity of a warrant to remove to another district or place for commitment or trial a person charged with a criminal offense against the United States, or to test the validity of such person's detention pending removal proceedings.
>
> (c)(1) Unless a circuit justice or judge issues a certificate of appealability, an appeal may not be taken to the court of appeals from–
>
> (A) the final order in a habeas corpus proceeding in which the detention complained of arises out of process issued by a State court; or
>
> (B) the final order in a proceeding under section 2255.

(2) A certificate of appealability may issue under paragraph (1) only if the applicant has made a substantial showing of the denial of a constitutional right.

(3) The certificate of appealability under paragraph (1) shall indicate which specific issue or issues satisfy the showing required by paragraph (2).

28 U.S.C. § 2253.

If a court denies a petitioner's petition, the court may only issue a certificate of appealability "if jurists of reason could disagree with the district court's resolution of his constitutional claims or that jurists could conclude the issues presented are adequate to deserve encouragement to proceed further." Miller-El, 123 S.Ct. at 1034; Slack v. McDaniel, 529 U.S. 473, 484 (2000). While the petitioner is not required to prove the merits of his case, he must demonstrate "something more than the absence of frivolity or the existence of mere good faith on his . . . part." Miller-El, 123 S.Ct. at 1040.

In the present case, the Court finds that reasonable jurists would not find the Court's determination that Petitioner is not entitled to federal habeas corpus relief debatable, wrong, or deserving of encouragement to proceed further. Petitioner has not made the required substantial showing of the denial of a constitutional right. Accordingly, the Court hereby DECLINES to issue a certificate of appealability.

**ORDER**

Accordingly, IT IS HEREBY ORDERED that:

1. The Petition for Writ of Habeas Corpus is DENIED with prejudice;

2. The Clerk of Court is DIRECTED to enter judgment; and

3. The Court DECLINES to issue a certificate of appealability.

IT IS SO ORDERED.

Dated:     August 11, 2008                    /s/ John M. Dixon
                                              UNITED STATES MAGISTRATE JUDGE